1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Mahwish Choudhry,                        No. 1:21-cv-01287 KJM SAB

12                     Plaintiff,             ORDER

13          v.

14   County of Tulare, et al.,

15                     Defendants.

16

17         Mahwish Choudhry, a practicing Muslim, alleges California Highway Patrol (CHP)

18   officers Raul Pimental and Carlos Cervantes (State defendants), acting in their individual

19   capacities, and Tulare County as well as Michael Boudreaux acting in his official capacity as

20   head of the Tulare County Sheriff's Department ("Sheriff's Department" and, collectively,

21   "County defendants") violated her rights under the First Amendment, the Religious Land Use and

22   Institutionalized Persons Act (RLUIPA), and California state law.  Her claims are based on

23   defendants allegedly forcing her to remove the hood she was using as a hijab and taking her

24   mugshot with her head uncovered while she was briefly incarcerated at the Tulare County pre-

25   trial booking facility (the Facility).[1]  Now both State defendants and County defendants move for

---

[1] Choudhry also named DOE Officers 1-10 in their official capacities as defendants but
has not moved to substitute named individuals in their stead.  The court thus **dismisses** all DOE
defendants without prejudice.  *See* Fed. R. Civ. P. 4(m) (providing for dismissal if defendant not

1

1   summary judgment.  As described more fully below, the court **grants** State defendants' motion

2   and **grants** in part and **denies** in part County defendants' motion.

3   ## I.    PROCEDURAL BACKGROUND

4   Choudhry filed suit in this court in August 2021.  *See* Compl., ECF No. 1.  In the

5   operative complaint, Choudhry alleges under 42 U.S.C. § 1983 that Cervantes and Pimental

6   acting in their personal capacities violated her First Amendment rights.  *See* First Am. Compl.

7   ¶¶ 63–75, ECF No. 40.  Choudhry also brings a § 1983 First Amendment claim against County

8   defendants, presumably under a theory of liability based on *Monell v. Department of Social*

9   *Services of New York*, 436 U.S. 658 (1978), alleging the County defendants' "acts or omissions,

10  policies, and customs, do not further any compelling government interest."  *See id.* ¶ 71.

11  Choudhry also alleges County defendants violated her rights under RLUIPA, 42 U.S.C. § 2000cc,

12  when they forced her to take her hijab off during her incarceration at the Facility.  *See id.* ¶¶ 51–

13  62.  Finally, Choudhry alleges County defendants violated her rights under the California

14  Constitution, *See* Cal. Const. Art. I, § 4, the Tom Bane Act, *see* Cal. Civ. Code § 52.1, and the

15  Ralph Civil Rights Act, *see* Cal. Civ. Code §§ 51.7, 52(b), when they forced her to take her hijab

16  off during her incarceration at the Facility.  *See* First Am. Compl. §§ 76–93.  Choudhry seeks

17  compensatory, punitive, and nominal damages, along with civil penalties, and attorneys' fees.

18  *See id.* at 16–17 (Prayer for Relief).[2]  Choudhry also seeks declaratory relief and an injunction

19  requiring County defendants to implement policies prohibiting the forcible removal of hijabs in

20  the presence of men and the taking of booking photographs of Muslim women without their

21  hijabs on.  *See id.*  Choudhry also wants County defendants to destroy the photographs taken of

22  her without her hijab and all reproductions of these same photographs in their possession.  *See id.*

---

served within 90 days after complaint filed); *see also* Fed. R. Civ. P. 10(a) (complaint must
"name all the parties").

[2] All page citations are to the top right by the CM/ECF system except citations to
deposition transcripts.  Depositions are cited to the original page numbers of the deposition
transcript.

On June 24, 2022, the assigned magistrate judge issued the scheduling order for the case.[3] *See* ECF No. 50.  The magistrate judge set the dispositive motions deadline for September 15, 2023.  *See id.* at 5.  On April 11, 2023, the case was reassigned to a different district judge upon the retirement of the original presiding judge.  *See* Order, ECF No. 53.  On April 17, 2023, the assigned magistrate judge, upon stipulation of the partes, extended all of the deadlines in the scheduling order by 90 days making the deadline for filing dispositive motions December 15, 2023.  *See* Order at 2, ECF No. 57.

On December 15, 2023, both State defendants and County defendants filed motions for summary judgment.  *See* ECF Nos. 64, 65.  According to the local rules, Choudhry had 14 days to file an opposition to both motions for summary judgment.  *See* E.D. Cal. L.R. 230(c).  On December 20, 2025—five days late—Choudhry filed her own motion for summary judgment.  *See* ECF No. 66.  Her motion is addressed only to County defendants.  *See id.* at 2 ("To defendant Sheriff Michael Boudreaux and the Tulare County Sheriff's Department (County Defendants)").  The memorandum accompanying the motion, similarly, does not seek summary judgment against the State defendants, Cervantes and Pimental.  *See* Pl.'s Mem., ECF No. 66-1.  On the same day, Choudhry also filed a motion for miscellaneous relief, requesting the magistrate judge find her motion for summary judgment to be timely filed.  *See* ECF No. 67.  After County defendants filed an opposition to Choudhry's motion for miscellaneous relief, *see* ECF No. 69, the magistrate judge found Choudhry had not shown good cause for her delayed filing and ruled the motion to be untimely filed.  *See* Order (Dec. 22, 2023), ECF No. 70.  Choudhry has not moved for reconsideration and at oral argument on defendants' motions, Choudhry conceded her motion was terminated and is no longer before the court.

On December 29, 2023, 14 days after both County and State defendants had filed their motions for summary judgment and the last day Choudhry could timely file an opposition according to the local rules of this District, Choudhry filed an "opposition" brief.  *See* ECF No.

---

[3] For cases originally filed in this District's Fresno courthouse, the magistrate judge presides over all pretrial scheduling conferences and the final pretrial conference. *See* E.D. Cal. L.R. 302(c)(13).

1   71.  The brief, however, has the same title as Choudhry's memorandum in support of her motion

2   for partial summary judgment: "Plaintiff Mahwish Choudhry's Brief in Support of Motion for

3   Summary Judgment Against Sheriff Michael Boudreaux."  *See id.* at 1 (compare with Pl.'s Mem.

4   at 1).  There are some differences between the two briefs: the memorandum, for example, had a

5   statement of undisputed facts embedded within it, while the "opposition" presents its undisputed

6   statement of facts in a separate filing.  *Compare* Pl.'s Mem. at 6–18 *with* Pl.'s Stmt. Undisp. &

7   Disp. Mat. Facts (SUMFs), ECF No. 71-1.  Choudhry also has added paragraphs that respond to

8   County Defendant's motion.  *See, e.g.*, Opp'n at 11 ("Tulare County appears to argue that a

9   violation of someone's religious rights . . . cannot give rise to a RLUIPA violation.")

10       But plaintiff's brief, even with these slight modifications, omits any substantive references

11   to State defendants.  Crucially, in the opposition's substantive section on her First Amendment

12   claim, the only claim Choudhry brings against State defendants Cervantes and Pimental,

13   Choudhry has copied, word for word, her original motion for summary judgment.  *Compare* Pl.'s

14   Mem. at 24–29 *with* Opp'n at 17–22.  The only differences between the two sections are six

15   headings in bold added to the latter.  *See* Opp'n at 17–22.  In the first five of these headings,

16   Choudhry adds only the words "and CHP Defendants."  The sixth heading is new: it states, "CHP

17   Defendants are not entitled to Qualified Immunity."  *Id.* at 22. But following this heading, there

18   is no text at all.

19       In their reply, State defendants argue Choudhry has not opposed their motion for summary

20   judgment because she has not provided any substantive arguments as to why her claims against

21   Cervantes and Pimental should survive, and in particular has not provided any argument in

22   opposition to State defendants' request for qualified immunity.  *See* State Defs.' Reply at 2, ECF

23   No. 73.

24       In their reply, County defendants complain that Choudhry's condensing her opposition to

25   two motions for summary judgment into one document makes "rendering a response . . . wholly

26   unmanageable and confusing."  Cnty. Defs.' Reply at 2, ECF No. 74.  County defendants also

27   argue Choudhry advances for the first time a new claim in her opposition brief: a failure to train

28   theory of *Monell* liability.  *See id.* at 5, 8–9.  County defendants argue Choudhry made no such

4

1  claim in her operative complaint and requiring them to respond now "blind side[s] [County]
2  defendant[s] with a new legal issue after the bulk of discovery has likely been completed." *Id.* at
3  4.

4      On October 11, 2024, this case was reassigned to the undersigned. *See* Order, ECF No.
5  77. Both motions for summary judgment have been briefed in the manner described above. On
6  June 5, 2025, the court heard oral argument on both motions. Gadeir Abbas and Layli Shirani
7  appeared on behalf of Choudhry. *See* Mins. Mot. Hr'g (June 5, 2025), ECF No. 91. Jennifer L.
8  Varner appeared for County defendants. *See id.* Amie Bears appeared on behalf of State
9  defendants. *See id.*

10  **II.    CLARIFYING THE RECORD: STATEMENTS OF FACT AND
11  EVIDENTIARY OBJECTIONS**

12      Under Federal Rule of Civil Procedure 56, litigants who move for or oppose summary
13  judgment must cite "particular parts of materials in the record" to show specific facts are
14  disputed, undisputed or cannot be proved, as the case may be. *See* Fed. R. Civ. P. 56(c)(1). This
15  district's local rules implement that rule by requiring a separate statement proposing undisputed
16  facts. *See* E.D. Cal. L.R. 260(a). The separate statement must "cite the particular portions" of the
17  record that establish each proposed fact as "undisputed." *Id.* The opposing party must then
18  respond to each proposed fact on the list and either admit or deny that the fact is undisputed. *See*
19  E.D. Cal. L.R. 260(b). If the opposing party contends the fact is disputed, it must cite "the
20  specific particular portions" of the record showing the fact is disputed. *Id.*

21      State and County defendants both have submitted statements of undisputed fact. *See* State
22  Defs.' Stmt. Undisp. Mat. Facts (SUMFs), ECF No. 65-2; Cnty. Defs.' Stmt. Undisp. Mat. Facts
23  (SUMFs) No. 9, ECF No. 64-2. County defendants also filed a "Joint Statement of Undisputed
24  Facts." *See* ECF No. 64-3. Counsel for County defendants, Judith Chapman, has filed a
25  declaration that attaches email exchanges between her and Choudhry's then-counsel Kimberly
26  Noe-Lehenbauer over filing a joint statement of undisputed facts. *See* ECF No. 74-2. Noe-
27  Lehenbauer provided Chapman with a redlined-document. *See id.* at 7–15. The facts Choudhry
28  could not agree to were crossed out while the facts she could agree to were not. *See id.* County

defendants then submitted the Joint Statement of Undisputed Material Facts, using only the facts Noe-Lehenbauer did not cross out. *See* Joint Stmt. Undisp. Facts. Choudhry now disputes some of the facts appearing in the Joint Statement of Undisputed Facts and asserts the joint statement of undisputed facts should not be part of the record. *See* Pl.'s SUMFs at 2–3. The court thus construes the "Joint Statement" as part of the County defendants' separate "Statement of Undisputed Material Facts."

Regarding the statement of facts she does provide, Choudhry has not abided by Local Rule 260(b). Instead of responding to each proposed undisputed fact submitted by the County and State defendants, Choudhry appears to only have listed those facts she disputes. *See* Pl.'s SUMFs at 2–8. She has not responded to many other facts. For example, she has not indicated her position regarding County defendants' ninth statement of undisputed material fact, that an "inner hijab or head scarf is not visible in any of the jail surveillance tapes taken of Plaintiff at the jail and no inner hijab or headscarf was placed in the property bag." *See* Cnty. Defs.' SUMFs No. 9. The court construes all the facts to which Choudhry has not responded as undisputed.

Choudhry has disputed some of both County and State defendants' statements of facts, but she has not made any evidentiary objections. *See generally* Pl.'s SUMFs. State defendants have not objected to or disputed Choudhry's statement of facts. County defendants have disputed and have made evidentiary objections to Choudhry's Statement of Undisputed Facts. *See* Cnty. Defs.' Reply Pl.'s SUMFs, ECF No. 74-1. The court overrules all County defendants' evidentiary objections unless indicated otherwise in the background section below. *See Burch v. Regents of University of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (warning litigants against appending long lists of objections relating to relevance or form).

### III.    UNDISPUTED AND DISPUTED FACTS

The court has compared the parties' respective statements of fact and the underlying record and reviewed the relevant deposition transcript material and video footage. Unless otherwise stated, the following facts are undisputed.

Choudhry is a Muslim woman who lives in Santa Clara, California. Choudhry Dep. at 19, ECF No. 71-2. As part of her faith, since the age of thirteen, Choudhry has covered her hair and

1    head while in public interacting in the mixed company of men who are not immediate family.

2    *See id.* at 31, 110.  Being seen in public in the company of men without a head covering makes

3    Choudhry feel as if she is "naked" and is "hurtful" "traumatic" and "embarrassing."  *Id.* at 110–

4    11.

5         Early in the morning of July 31, 2020, Choudhry was driving a red Ford Focus with a

6    female friend, Miski Abdullahi, in the passenger seat and Choudhry's two children in the back

7    seat.  Cervantes Resp. Interrogs. at 5–6, ECF No. 71-9.  They were travelling southbound on State

8    Route 99 just south of Merritt Avenue in Tulare, California, *see id.*, heading to a hotel near

9    Sequoia National Park, which they planned to visit the next day, *see* Choudhry Dep. at 20–21.  At

10   12:58 a.m., Cervantes says he and Pimental noticed the Focus was travelling at a high rate of

11   speed and was switching lanes.  *See* Cervantes Resp. Interrogs. at 5.  They clocked the car going

12   94 miles per hour in a 70-mile-per-hour zone and pulled it over.  *See id.*  After being pulled over,

13   Cervantes says Choudhry falsely claimed she was Abdullahi, because her driver's license had

14   been suspended.  *See id.*. at 6.  At 1:25 a.m., Cervantes claims he arrested Choudhry after

15   discovering Choudhry's true identity and after finding probable cause she had provided false

16   identification to a peace officer and had been driving on a suspended license.  *See* Cnty. Defs.'

17   Ex. 26 at 20 (Probable Cause Decl.), ECF No. 64-7; Pl.'s Ex. G (Field Info. Sheet) at 2, ECF No.

18   71-8.  Pimental operated as backup.  Pimental Dep. at 45, ECF No. 71-6.  At oral argument,

19   Choudhry clarified she is not challenging the lawfulness of her arrest.  Cervantes and Pimental

20   eventually transported Choudhry to the Facility, arriving at the intake port known as the Sallyport

21   at 2:15 a.m.  *See* Cervantes Resp. Interrogs. at 7.  Choudhry ended up staying at the Facility for

22   just under six hours.  *See generally* Videos 1–20.  Most of Choudhry's stay at the Facility has

23   been captured on video.[4]  *See id.*

24         What Choudhry was wearing during this six-hour period is disputed.  One aspect of the

25   dispute is over the definition of "hijab."  In her operative complaint, Choudhry defines a hijab as

26   a "headscarf worn by Muslim women that covers their head, hair and neck."  First Am. Compl. at

27   6 n.1.  Choudhry now concedes she was not wearing "a hijab as described in the [complaint]

────────────────

        [4] County defendants have lodged the videos at ECF No. 64-4.

1    . . . .”  Pl.’s SUMFs No. 34.  Rather, Choudhry was wearing a short-sleeved hooded sweatshirt for

2    the six hours she was in custody.  *See generally* Videos 1–20.  The hood was draped over her

3    head during the entirety of her arrest and transport to the Facility.  *See* Choudhry Dep. at 82.

4    Both State and County defendants argue a hooded sweatshirt is not a hijab.  *See* State Defs.’

5    Mem. at 3, ECF No. 65-1; Cnty. Defs.’ Mem. at 13, ECF No. 64-1.  Choudhry, on the other hand,

6    submits a hood on a sweatshirt can serve as a hijab because hijab simply means “barrier” or

7    “cover” in Arabic.  Pl.’s SUMFs at 6 (responding to State Defs.’ SUMFs No. 1).

8         The parties also dispute whether Choudhry was wearing an “inner hijab” underneath the

9    hood.  Choudhry describes the inner hijab she claims she was wearing on July 31, 2020, as a

10   “beanie” that was meant to cover the top of her head down to “half an inch” below her hairline.

11   Choudhry Dep. at 154–55.  Choudhry claims she had the inner hijab on during the arrest and

12   during her booking but, at some point, lost the inner hijab while at the Facility.  *See id.* at 82.

13   County defendants argue there is no indication from any of the video evidence to support

14   Choudhry’s assertion she was wearing an inner hijab.  Cnty. Defs.’ SUMFs No. 9.  County

15   defendants also assert there was no beanie placed in Choudhry’s property bag, which the County

16   used to store items such as jewelry, hats and beanies persons detained were required to take off

17   upon arrest and during their detention.  *See* Cervantes Dep. at 85, ECF No. 71-7; Pimental Dep. at

18   83; Martinez Decl. ¶ 30, ECF No. 64-10; Cnty. Defs.’ Ex. 28 (Choudhry Property Bag), ECF No.

19   64-7 (only item listed is cell phone).  State and County defendants argue from this absence of

20   evidence that Choudhry was definitively not wearing an inner hijab.  Choudhry does not

21   challenge County defendants’ assertion that the video evidence does not support her claim she

22   was wearing an inner hijab, but simply claims the video is “not of sufficient clarity to say there

23   was nothing under Choudhry’s hood.”  Pl.’s SUMFs at 7 (responding to State Defs.’ SUMFs No.

24   7).

25        Upon Choudhry’s arrival at the Sallyport, Tulare County Sheriff’s correctional deputy

26   Taylor Hobson, who is not a defendant in this case, conducted a pat-down search of Choudhry,

27   who was handcuffed throughout the exchange.  *See generally* Video 1; Hobson Dep. at 8–12,

28   /////

8

1    ECF No. 71-10.  During the pat-down, Hobson removed Choudhry's hood from her head.  *See*

2    Video 1 at 1:28.

3        Hobson testified at deposition that the jail has an unofficial policy of not allowing inmates

4    to wear hoods or hats, absent a request for a religious accommodation.  *See* Sheriff's Dep't Dep.

5    at 192–95, ECF No. 71-5[5]; Hobson Dep. at 24–26.  The purpose of the unofficial policy is

6    twofold, to allow correctional deputies to more easily identify inmates while they sit in the

7    waiting area of the intake room and to prevent contraband from entering the Facility.  *See* Hobson

8    Dep. at 25–26; Sheriff's Dep't Dep. at 192–95; Martinez Decl. ¶ 26.  Correctional deputies often

9    change shifts, and new deputies might not otherwise be able to easily recognize those prisoners

10   already in the intake port waiting area presumably by comparing their faces to their booking

11   photo.  *See* Martinez Decl. ¶ 26.  Hats and hoodies might also cause "problems between inmates,

12   especially in the intake area where emotions are often high, inmates are often irrational, and/or

13   under the influence of drugs or alcohol."  *Id.*  It appears the Facility is worried about fights

14   erupting over the potential for identifying gang membership based on apparel.  *See id.*  Hobson

15   avers she took the hood off of Choudhry's head to abide by the County policy.  *See* Hobson Dep.

16   at 24–26.

17       Choudhry claims her inner hijab remained on her head after Hobson removed her

18   sweatshirt hood.  Choudhry Dep. at 53.  Once she felt Hobson attempt to pull the inner hijab off,

19   Choudhry testified she told Hobson, "This is for my religion.  My head is covered for my

20   religion.  Can you please put it back on?"  *Id.* at 54.  According to Choudhry, Hobson "put [the

21   hood] back on quietly.  She didn't say anything else to me, and she was respectful about that."  *Id.*

22   At her deposition, Hobson explained she

23           removed [Choudhry's] hood for just a regular pat down.  And in the
24           jails we typically for people who bring in—wear their hoods coming
25           in, we usually tell them that they need to take it off.  So I just took it
26           off of her.  I patted her down.  Once I completed the pat down, I

---

[5] Choudhry deposed Lieutenant Javier Martinez as the designated official to speak on behalf of the Sheriff's Department under Federal Rule of Civil Procedure 30(b)(6).  Choudhry also deposed Martinez in his personal capacity as an employee of the Facility.  *See* Martinez Dep., ECF No. 71-14.

9

1                                    remember she turned to me and she said she needed to have her head
2                                      covered, and that's when I immediately just put it back on her.  I
3                                      didn't think twice about it.

4 Hobson Dep. at 24.  Hobson thinks Choudhry may have said the covering was for religious

5 reasons but did not otherwise specify her religious faith.  *See id.* at 24.  The video shows Hobson

6 taking Choudhry's hood off at 2:16:56 a.m.  *See* Video 1 at 1:28.  While there is no sound, it does

7 appear Choudhry says something to Hobson and then Hobson immediately puts Choudhry's hood

8 back on at 2:18:20 a.m.  *See id.* at 2:53.  The video does not show Choudhry wearing an inner

9 hijab while her hood was off.  *See id.* at 1:28–2:53.  Lieutenant Javier Martinez, the County

10 defendants' designated person most knowledgeable regarding Tulare County Sheriff's

11 Department's booking policies and procedures, particularly with respect to religious

12 accommodations, *see* Fed. R. Civ. P. 30(b)(6), testified at his deposition that accommodation

13 requests for wearing religious headwear like a hijab typically are "documented in the inmate file."

14 Sheriff's Dep't Dep. at 63.  In the early morning of July 31, 2020, Hobson told no one else

15 working at the jail about Choudhry's request to wear her hood, whether for religious purposes or

16 otherwise.  *See* Hobson Dep. at 81.  She did not tell Choudhry her request for an accommodation

17 had been granted when she replaced the hood on Choudhry's head.  *See id.* at 82.  Nor did she

18 record Choudhry's request on any of Choudhry's paperwork.  *See id.* at 81–82.

19       Immediately after Hobson put Choudhry's hood back on, she escorted Choudhry to the

20 adjoining medical examination room, where Cervantes and Pimental were filling out paperwork

21 and waiting for Choudhry to be cleared so she could be formally admitted into the Facility and

22 leave their custody.  *See* Pimental Dep. at 71.  All parties agree that right before Cervantes

23 removed Choudhry's handcuffs, he pulled Choudhry's hood off.  *See* Cervantes Decl. ¶ 8, ECF

24 No. 65-5; Cervantes Dep. at 53; Choudhry Dep. at 55; Video 2 at 0:23.  The hood remained off

25 during the entirety of Choudhry's 13-minute stay in the medical room.  *See* Video 2 at 0:23–

26 13:40.  Hobson, upon viewing the video in her deposition, confirmed she was briefly standing in

27 the doorway when Cervantes took the hood off.  *See* Hobson Dep. at 104–05; Video 2 at 0:11–

28 0:23.  Hobson was "a couple feet" away from Cervantes.  Sheriff's Dep't Dep. at 183.  Hobson

1   states, however, she was looking at another door and was not paying attention to what Cervantes

2   was doing.  *See* Hobson Dep. at 105.  Had she seen what he was doing, Hobson says, "I would

3   have told him, you know, I just put it on her."  *See id.* at 105, 107 ("I would have told him, I just

4   put it back on her.").  Choudhry says she asked Cervantes, "Can you please put my hoodie back

5   on, my inner hijab back on?  This is for my religion.  My head needs to be covered for my

6   religion."  Choudhry Dep. at 55.  Choudhry says Cervantes told her, "You don't get to wear

7   anything in jail."  *Id.*  Hobson has testified she did not hear the conversation.  *See* Hobson Dep. at

8   107.  Hobson, who had never fully entered the medical room, disappears entirely from the video

9   shortly thereafter.  *See* Video 2 at :54.

10       According to Cervantes, the reason why he took the hood off was because a Sheriff's

11   Department employee in the room adjacent to the medical room—separated by glass windows—

12   motioned to him and told Cervantes, either verbally or with non-verbal motions, to take off

13   Choudhry's hood.  Cervantes Dep. at 53, 61.[6]  Cervantes asserts Choudhry did not have anything

14   on her head underneath her hood.  *Id.* at 76.  Cervantes cannot recall if Choudhry said anything to

15   him and does not recall if she asked to keep her head covered for religious reasons.  *See id.* at 64,

16   66.  Cervantes remembers he said something to the effect of "you can't wear this" before he

17   lowered Choudhry's hood.  *Id.* at 53.  Cervantes also says he does not remember hearing

18   Choudhry's request to Hobson when they were in the other room.  *See id.* at 86.  Pimental was

19   stationed on the left side of the medical room and neither Cervantes nor Pimental asserts he had

20   any interaction with Choudhry while she was in the medical room.  *See* Pimental Dep. at 71; *see*

21   *generally* Video 2.

22       The County says the medical examination is conducted for the purposes of evaluating

23   whether an arrestee is healthy enough to be admitted to the Facility or if she needs to be taken to

24   the hospital.  *See* Sheriff's Dep't Dep. at 95, 104.  A nurse evaluated Choudhry for these reasons

---

[6] Choudhry objects to this fact, arguing "Defendants have provided no evidence of their contention that Tulare County Jail staff directed them to remove Choudhry's hood."  Pl.'s SUMFs at 7–8 (responding to State Defs.' SUMFs), No. 12.  But Cervantes' testimony at deposition is evidence.  *See id.*  Choudhry has failed to establish this fact as being disputed and the court treats the fact as undisputed.

1    and cleared her to be booked into the jail.  *See* Cervantes Dep. at 27.  When Choudhry left the

2    medical room, she was bareheaded, at 2:32 a.m.  *See* Video 2 at 13:49.  When Choudhry left the

3    medical room, the CHP officially transferred custody of Choudhry to the Sheriff's Department.

4    Delgado-Morales Dep. at 152–53, 189, ECF No. 71-11; Sheriff's Dep't Dep. at 85; Cervantes

5    Dep. at 27.  Pimental and Cervantes had no further interaction with Choudhry after she left the

6    medical room, although Choudhry claims she could see them through a window from the intake

7    room talking to Sheriff's Department officers.  *See* Choudhry Dep. at 59.

8          Choudhry, her head still uncovered, then crossed back through the Sallyport and entered

9    the intake room at 2:33 a.m.  *See generally* Video 3.  The intake room also serves as a waiting

10   room and when Choudhry arrived, there were four men sitting in some of the waiting room

11   chairs.  *See* Video 4 at 0:50.  Choudhry went to the front counter of the room and interacted with

12   Sheriff's Department correctional deputy Aaron Delgado-Morales, who is not a defendant; deputy

13   Delgado-Morales told her to fill out some paperwork.  *See* Video 4 at 0:08; Delgado-Morales

14   Dep. at 138.  As Choudhry began filling the paperwork out, Delgado-Morales left the counter.

15   *See* Video 4 at 0:10.  The paperwork was an "Inmate Classification Questionnaire," and both

16   Choudhry and County defendants have provided a copy of Choudhry's responses.  *See* Cnty.

17   Defs.' Ex. 27 at 22, ECF No. 64-7; Pl.'s Ex. O at 1–2, ECF No. 71-16. There is no question on

18   the questionnaire relating to religious accommodations.  *See* Cnty. Defs.' Ex. 27 at 22.  In

19   response to the question, "Is there *any* reason why you should be kept separate from other

20   inmates," Choudhry marked "No."  *See id* (emphasis in original).  She also left unanswered the

21   question, "Do you anticipate any problems with any other inmates while in custody?"  *See id.*

22          At 2:37 a.m., Delgado-Morales motioned for Choudhry to come to the back of the

23   booking room where the Sheriff's Department had cordoned off a corner of the room and

24   transformed it into a booking photo area.  *See* Video 4 at 3:45–4:06; Choudhry Dep. at 57–58;

25   Delgado-Morales Dep. at 139.  There is no door to the booking photo area and people in the

26   intake room can see into it.  *See* Delgado-Morales Dep. at 140; Choudhry Dep. at 57–58.

27          The booking photo area had a poster hung on the wall, entitled "Your Mugshots Should

28   Look Much Like This."  Cnty. Defs.' Ex. 24 at 16 (Mugshot Poster), ECF No. 64-7; *see generally*

12

1    Video 5.  Delgado-Morales avers in her declaration the poster "gave [me] and the inmate

2    directions on how to take a good booking photo.  In 2020, I used the sign for direction on how to

3    take a good photo and was familiar with the requirements."  Delgado-Morales Decl. ¶ 2, ECF No.

4    64-8.  At the bottom of the poster, there is a picture of a man with a bandage over his head.  *See*

5    Mugshot Poster.  To the right of this photo, the poster reads: "Head coverings should be removed

6    unless they serve a religious or medical purpose."  *Id.*

7        Choudhry's head was uncovered during the entire time she was in the booking photo area.

8    *See generally* Video 5.  When Choudhry reached that area, Delgado-Morales directed her to a

9    wall with height markings on it, pointed to the poster with the mugshot instructions and then took

10   three photos of her: one facing straightforward and two profile shots, one each of the left and

11   right side of Choudhry's face.  *See* Video 5 at :12–:59; Delgado-Morales Dep. at 63.  Choudhry

12   had no head covering on for all three photos.  *See* Video 5 at 0:12–0:59.  Delgado-Morales then

13   took Choudhry's fingerprints.  *See* Video 5 at 1:51–6:05.  Choudhry left the booking photo area

14   and returned to the intake room at 2:43 a.m.  *See* Video 6 at 0:01.

15       The parties dispute whether Choudhry requested an accommodation from Delgado-

16   Morales.  Choudhry claims she asked Delgado-Morales before the photos were taken if she could

17   "put my head cover back on."  Choudhry Dep. at 59.  According to Choudhry, Delgado-Morales

18   told her, "No, you cannot [put the hood back on]."  *Id.*  Deputy Delgado-Morales then told

19   Choudhry she was not allowed "to put anything on your head in jail."  *Id.*  According to

20   Choudhry, she responded, "This is for my religion.  I cannot take a picture with it.  Even you are

21   not allowed to see my hair."  *Id.*  Delgado-Morales denies this exchange ever happened.  *See*

22   Delgado-Morales Dep. at 145, 185.  While he does not remember his exact words to Choudhry,

23   *see id.* at 141–45, Delgado-Morales testified he would have remembered a religious

24   accommodation request, and he would have brought such a request "to his supervisor."  *See id.* at

25   145, 185; *see also* Delgado-Morales Decl. ¶ 8.

26       The parties dispute whether the public can access the booking photos.  Choudhry admits

27   she has no evidence a member of the public received or viewed her booking photographs.  *See*

28   Cnty. Defs.' Ex. 29 at 35 (Req. for Admission No. 46), ECF No. 64-7.  Choudhry also admits to

1    not making a formal request to the Sheriff's Department to destroy the photos before filing this

2    lawsuit. *See* Req. for Admission No. 53 at 36. County defendants further assert they have

3    removed Choudhry's photos and her "booking jacket"—a collection of documents comprising her

4    probable cause declaration, property inventory, money receipt, inmate classification

5    questionnaire, notice of telephone recording, cite to appear notice, booking release checklist, and

6    coversheet, *see* Sheriff's Dep't Dep. at 232—from its computer database and currently store the

7    information in a "hard file" in the locked office of a female lieutenant under direction that only

8    female employees of the Sheriff's Department may view Choudhry's file and only in relation to

9    this case. *See* Martinez Decl. ¶ 31. Choudhry argues the photos are subject to California public

10   records requests, which County defendants dispute. *See* Opp'n at 5, ECF No. 71; Cnty. Defs.'

11   Reply Pl.'s SUMFs at 26 (responses to Pl.'s SUMFs No. 24).[7]

12        After her photos had been taken and after leaving the photo booking area, Choudhry

13   remained in the intake area for over an hour, where she sat on a chair with her head uncovered,

14   still wearing the sweatshirt with the hood down. *See generally* Videos 6–7. At least one and up

15   to four men were in the waiting room with Choudhry at that time. *See id.* Choudhry submits she

16   "felt more out of control. Like now, great. My hijab is taken off of me. Everybody can see me."

17   Choudhry Dep. at 63. After more than an hour had passed, at 3:46 a.m., staff at the Facility

18   escorted Choudhry out of the intake area and placed her in a single person holding cell. *See*

19   *generally* Videos 7–8. Choudhry's head was still uncovered when she went into the cell. *See*

20   Video 8 at :04. There are no videos of Choudhry while she was inside the cell. At 6:03 a.m.,

21   correctional staff let Choudhry out of her holding cell. *See* Video 10 at 17:19. At that point,

22   Choudhry once again had her hood draped over her head. *See id.* at 17:31. At 6:04 a.m.,

---

[7] Choudhry asserts as an undisputed fact that her booking photo remains in the Sheriff's Department jail management system. *See* Pl.'s SUMFs No. 23. County defendants object to this statement, arguing the evidence Choudhry relies on to make it—citations to the Sheriff's Department deposition and the deposition of Delgado-Morales—does not support the "fact." *See* Cnty. Defs.' Reply Pl.'s SUMFs at 26 (responses to Pl.'s SUMFs No. 23). County defendants' objection is sustained as neither Delgado-Morales nor Tulare County's deponent testified Choudhry's photo is still within the jail management system, and there is no other evidence in the record supporting Choudhry's position that it is stored there.

1    Choudhry returned to the waiting room in the intake area and sat down on the chairs.  *See*

2    *generally* Video 11.  She signed some papers and called her friend for a ride.  *See* Video 11 at

3    6:35–9:14; Choudhry Dep. at 70.  Her hood remained draped over her head while she was in the

4    waiting room.  *See generally* Video 11; Video 12.  At 7:53 a.m., Choudhry, with her hood still

5    draped over her head, left the intake area with Sheriff's Department correctional deputy Stacey

6    Johnson, who is not a defendant.  *See* Video 12 at 49:30.

7          After passing by the holding cells, as Johnson was escorting her, *see* Videos 13–14, at

8    7:54 a.m. Choudhry took off her hood again.  *See* Video 15 at :19; Video 16 at :14.  The parties

9    dispute what happened here.  Choudhry claims Johnson told her she could not wear a head

10   covering in the Facility.  *See* Choudhry Dep. at 119.  Johnson, meanwhile, does not remember

11   what if anything she said to Choudhry, but claims she would have allowed inmates to wear hoods

12   as they were exiting the Facility.  *See* Johnson Dep. at 35–37, ECF No. 71-12.  Johnson then took

13   Choudhry to retrieve her property bag.  *See* Videos 17–18.  After retrieving her property,

14   Choudhry draped her hood over her head as she exited into the public waiting lounge.  *See* Video

15   18 at 0:23.  Choudhry exited the Facility at 7:55 a.m.  *See* Videos 19, 20 at 0:16.

16         In her opposition to the County defendants' motion for summary judgment, Choudhry

17   alleges the County defendants failed to properly train their staff on religious accommodation

18   requests and, as a consequence, violated her First Amendment rights under *Monell*, 436 U.S. 658.

19   *See* Opp'n at 19–22.  Specifically, Choudhry asserts the County defendants did not properly

20   follow Sheriff's Department Policy 1013.  *See* Pl.'s Ex. L (Policy 1013), ECF No. 71-13.  Policy

21   1013, published in 2018 and operative in 2020 when Choudhry was in custody at the Facility,

22   establishes

23            [i]t is the policy of this office to permit inmates to engage in the
24            lawful practices and observances of their sincerely held religious
25            beliefs consistent with the legitimate governmental objectives of the
26            facility.

27   *Id.* at 2.  Policy 1013.11 addresses religious garments:

28            Inmates who practice a religion that requires particular modes of
29            dress, garments, headgear, etc., other than standard-issue clothing,

15

1    should generally be accommodated subject to the need to identify
2    inmates and maintain security.

3    Head coverings shall be searched before being worn in the housing
4    areas of the facility and shall be subject to random searches for
5    contraband.  Personal head coverings should be exchanged in favor
6    of office-supplied head coverings when available and appropriate.

7    Inmates wearing headscarves or other approved coverings shall not
8    be required to remove them while in the presence of or while visible
9    to the opposite sex, if they so desire.  Religious garments that
10    substantially cover the inmate's head and face shall be temporarily
11    removed during the taking of booking and identification
12    photographs.

13    To the extent reasonably practicable, alternative housing may be
14    considered to accommodate an inmate's need for religious attire,
15    while meeting the security needs of the facility.

16    *Id.* at 5–6.  The Facility had bought and maintained office-supplied hijabs since 2017.  *See* Cnty.

17    Defs.' Ex. 25 (Hijab Receipts) at 18, ECF No. 64-7.  Martinez testified that hijabs are "pre-

18    approved" as an accommodation for any inmate requesting to wear one.  *See* Sheriff's Dep't Dep.

19    at 152, 162.

20    It is undisputed Sheriff's Department correctional officers received some First

21    Amendment training.  *See* Sheriff's Dep't Dep. at 156.  The training comes in the form of daily

22    training bulletins—small exercises officers receive on a daily basis that help keep them apprised

23    of the Sheriff's Department's policies.  *See id.* at 157.  Hobson testified at deposition that she was

24    trained on the First Amendment at "core academy"—where aspiring correctional officers take

25    required classes before beginning their careers.  *See* Hobson Dep. at 18.  Hobson says she

26    receives ongoing training, albeit less than once per year, that covers religious accommodation

27    policies.  *See id.* at 19.  Johnson likewise says she has received training on the religious

28    accommodation policy, including regarding "religious diets" and "religious garments."  *See*

29    Johnson Dep. at 15–16.  Delgado-Morales similarly testified at deposition that he received

30    training on all of the Sheriff's Department's policies when he first began working as a

31    correctional deputy.  *See* Delgado-Morales Dep. at 181–83.  He remembers going over religious

32    accommodation policies during training but cannot recall anything specific about the training.

1  *See id.* at 181.  Cervantes has not received any training from the Sheriff's Department, but that is

2  not surprising given he works for CHP.  *See* Cervantes Dep. at 69.  Through "trial and error,"

3  however, Cervantes was aware he needed to take off inmates' hats and put them in their property

4  bag and pull back hoods if they were wearing a hooded sweatshirt before transferring them to the

5  Facility.  *See id.* at 30, 41.

6  Choudhry claims the confusion among the officers working at the Facility over the proper

7  interpretation of Policy 1013 is a consequence of poor training.  *See* Opp'n at 19–21.  For

8  example, upon examining Policy 1013 during her deposition, Hobson admits "[she] should have"

9  provided Choudhry with an office-supplied head covering at the Sally Port.  Hobson Dep. at 95.

10  Meanwhile, County defendants' representative testified that inmates generally are allowed to

11  keep on the hijab they are wearing on arrival at the Facility.  *See* Sheriff's Dep't Dep. at 62.

12  Choudhry also points to confusion over the interpretation of what "substantially covers" means in

13  the context of taking an inmate's mugshot.  *See* Opp'n at 20–21.  Martinez testified inmates can

14  have their mugshot taken with their hijab on.  *See* Martinez Dep. at 49.  He says only coverings

15  like a burqa that cover almost the entire face would need to be taken off for the photo.  *See id.* at

16  27–28.  Martinez also notes special marks, like identifying tattoos, need to be photographed and a

17  head covering could be taken off for that limited purpose.  *See id.* at 49–50.  Hobson and Johnson

18  have similar views: only a head covering that covers both the head and face would need to be

19  taken off.  *See* Hobson Dep. at 85–86; Johnson Dep. at 72.  Delgado-Morales, however, says any

20  covering over the hair, even if it does not cover the face, would need to be removed for the taking

21  of the mugshot.  *See* Delgado-Morales Dep. at 178.

22  Additionally, Choudhry claims County defendants do not provide appropriate religious

23  accommodation paperwork to inmates.  According to Sheriff's Department Policy 501.3, adopted

24  in 2019 and operative while Choudhry was in custody at the Facility, the Sheriff's Department's

25  pre-booking screening regulation requires:

26          All arrestees shall be screened prior to booking to ensure the
27          arrestee is medically acceptable for admission and that all arrest or
28          commitment paperwork is present to qualify the arrestee for

booking.  Required paperwork may include the following:

    (a)    Arrest Reports
    (b)    Probable cause declarations
    (c)    Warrants or court orders
    (d)    Victim notification information
    (e)    Special needs related to religious practices, such as diet, clothing and appearance (see the religious programs policy)
    (f)    Accommodation requests related to disabilities (see the Inmates with Disabilities policy)
    (g)    Information regarding suicidal statements or actions

Pl.'s Ex. N at 2 (Policy 501), ECF No. 71-15.  Only Subdivision (e), which pertains to religious accommodations, does not have a corresponding form arrestees must fill out when they arrive at the Facility.  *See* Sheriff's Dep't Dep. at 125–27.  The Sheriff's Department does not require its officers to ask arrestees if they require a religious accommodation or inform arrestees they have a right to a religious accommodation.  *See id.* at 127.  Further, Choudhry claims County defendants "ha[ve] produced no evidence to suggest [they] ever implemented, adequately trained, or followed through with the [501] policy in reality."  Opp'n at 10.

        Nevertheless, it is undisputed that both before and after Choudhry was detained at the Facility, the Sheriff's Department accommodated Muslim inmates by allowing them to wear a hijab.  County defendants have submitted a redacted photo and booking sheet of women Muslim inmates who received this accommodation.  *See* Cnty. Defs.' Exs. 31–32, ECF No. 64-7.  It also is undisputed the Sheriff's Department had three documented requests by inmates to wear a hijab, in 2019, 2020, and in 2023.  *See* Sheriff's Dep't Dep. at 56.  Each time, the Sheriff's Department accommodated the request.  *See id.*  The Sheriff's Department in 2021 allowed an inmate to keep a hijab on when her mugshot was taken.  *See id.* at 65–66.  Choudhry has provided no evidence, outside of her own case, of the Sheriff's Department's failing to provide an accommodation for an inmate requesting to wear a hijab in the five years preceding Choudhry's detention at the Facility.  *See* Req. for Admission No. 30.

## IV.    SUMMARY JUDGMENT

        Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

1  "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

2  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

3  of the suit under the governing law." *Id.*  "[M]ere allegation and speculation do not create a

4  factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075,

5  1081–82 (9th Cir. 1996) (citing *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995)).  The court

6  views the record in the light most favorable to the nonmoving party and draws reasonable

7  inferences in that party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

8  587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "If a party fails to

9  properly support an assertion of fact or fails to properly address another party's assertion of

10  fact . . . , the court may (1) give an opportunity to properly support or address the fact; (2)

11  consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the

12  motion and supporting materials—including the facts considered undisputed —show that the

13  movant is entitled to it, or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).  56(e)

14  thus prohibits "the grant of summary judgment 'by default even if there is a complete failure to

15  respond to the motion.'" *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (quoting

16  Fed. R. Civ. P. 56 Advisory Committee Notes (2010)).  The court may consider the moving

17  party's facts as undisputed, but still must "determine the legal consequences of these facts and the

18  permissible inferences from them.'" *Id.* (quoting Fed. R. Civ. P. 56 Advisory Committee Notes

19  (2010)).

20  **A.    State Defendants**

21      The court finds Choudhry has waived opposition to the motion for summary judgment by

22  State defendants Cervantes and Pimental.  As noted in the procedural background, Choudhry has

23  not made one substantive argument opposing State defendants' motion for summary judgment.

24  Nevertheless, State defendants must still show they are entitled to summary judgment based on

25  the facts the court deems undisputed. *See Heinemann*, 731 F.3d at 917.  As noted above,

26  Choudhry brings only a First Amendment claim against Cervantes and Pimental.

27      The Free Exercise Clause of the First Amendment bars state governments, under the

28  Fourteenth Amendment, from "prohibiting the free exercise" of religion.  U.S. Const. Amends. I

1    & XIV.  Prisoners maintain this right, "subject to limitations 'arising both from the fact of

2    incarceration and from valid penological objectives.'"  *Fuqua v. Raak*, 120 F.4th 1346, 1352 (9th

3    Cir. 2024) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)).  A prisoner must

4    show she has a sincerely held religious belief that was interfered with by government action.  *See*

5    *id.* (citing *Jones v. Slade*, 23 F.4th 1124, 1144 (9th Cir. 2022)).  If the prisoner makes such a

6    showing, the "burden shifts to the [defendant] to show that the regulation is 'reasonably related to

7    legitimate penological interests.'"  *Jones*, 23 F.4th at 1144 (quoting *Walker v. Beard*, 789 F.3d

8    1125, 1138 (9th Cir. 2015)).  In assessing whether a defendant has met this burden, courts apply

9    the factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987):

10          (1), whether there is a valid, rational connection between a state
11          interest and the prison regulation; (2), whether prisoners have an
12          alternative method of engaging in religious practice; (3), the impact
13          [an] accommodation of the asserted constitutional right would have
14          on guards and other inmates; and (4), the absence of ready
15          alternatives to the challenged regulation.

16    *Fuqua*, 120 F.4th at 1352 (citing *Walker*, 789 F.3d at 1138–39 (citing *Turner*, 482 U.S. at 89–

17    90)).  Courts in the Ninth Circuit apply this same test to detainees like Choudhry as they would to

18    incarcerated prisoners.  *See Safouane v. Fleck*, 226 F. App'x. 753, 764 (9th Cir. 2007) (citing

19    *Valdez v. Rosenbaum*, 302 F.3d 1039, 1047–49 (9th Cir. 2002)).  As with all § 1983 claims,

20    courts must analyze the individual participation of each defendant in the alleged violation.  *See*

21    *Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002).

22                    **1.    Pimental**

23          "A person deprives another of a constitutional right, within the meaning of section 1983,

24    if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act

25    which he is legally required to do that causes the deprivation of which [the plaintiff complains]."

26    *Leer v.* Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743

27    (9th Cir. 1978) (modifications in original).  There is no evidence Pimental even spoke to

28    Choudhry let alone touched her or required her to take off a head covering.  In other words, there

29    is no evidence he did an affirmative act.  Nor is there evidence he participated in the acts

1   performed by Cervantes or anyone else that allegedly violated Choudhry's First Amendment

2   rights.  The only evidence relating to Pimental is that he was in the medical room when Cervantes

3   took Choudhry's hood off, *see* Video 2, but Choudhry has made no argument that Pimental was

4   legally required to intervene or even knew she had asked for a religious accommodation.  *See*

5   *Leer*, 844 F.2d at 633.  Given these undisputed facts, no jury could find Pimental violated

6   Choudhry's constitutional rights.  The court need not reach the question whether Pimental is

7   entitled to qualified immunity.

8          The court grants State defendants' motion for summary judgment as to Pimental.

9              **2.    Cervantes**

10
11                 **a.   Constitutional Violation?**

12         The Ninth Circuit has found that a person's religious practices are interfered with when

13  someone working at the Facility "forbid[s] conduct that an inmate believes [s]he is religiously

14  compelled to do" or when someone working at the Facility "compel[s] an inmate to do that which

15  [s]he is religiously forbidden from doing."  *Fuqua*, 120 F.4th at 1353 (quoting *Jones*, 23 F.4th at

16  1140).  Choudhry's allegations are sufficient to create a dispute of material fact given that a

17  reasonable jury could find Cervantes infringed her sincerely held religious beliefs when

18  Cervantes took her hood off in the medical room and left it off until he transferred Choudhry to

19  the custody of the Facility.  *See* Video 2 at 0:23–13:50.  The pulling off of her hood forbade

20  Choudhry from engaging in conduct she felt religiously compelled to observe, wearing a head

21  covering in front of unrelated men.  A jury also could find the obverse as well, that it compelled

22  Choudhry to do something she was forbidden from doing, namely having her head uncovered in

23  front of unrelated men.  *See Fuqua*, 120 F.4th at 1353.

24         State defendants do not challenge Choudhry's sincerely held religious beliefs.  But they

25  do argue Cervantes' actions reflected a legitimate penological interest: the Facility, whose rules

26  Cervantes was required to follow, did not allow hats or hoodies during the booking process "for

27  the safety and security of the institution."  State Defs.' Mem. at 7.  As noted, County defendants

28  have asserted the Sheriff's Department's "no hoods or hats policy" is meant to aid correctional

29  deputies in the identification of inmates and to prevent problems between or among inmates.  *See*

1    Sheriff's Dep't Dep. at 192–95; Martinez Decl. ¶ 26.  To weigh whether the "no hoods or hats"

2    policy violated Choudhry's constitutional rights, the court must apply the factors set forth in

3    *Turner*.  *See Fuqua*, 120 F.4th at 1352 (citing *Walker*, 789 F.3d at 1138–39).

4         Choudhry has not challenged State defendants' asserted penological interest.  When the

5    "inmate does not present enough evidence to refute a common-sense connection between a prison

6    regulation and the objective that government's counsel argues the policy was designed to further"

7    the state has to present no further evidence to support its proffered penological interest, provided

8    the governmental objective is legitimate and neutral.  *Frost v. Symmington*, 197 F.3d 348, 357

9    (9th Cir. 1999).  Choudhry does not challenge the connection the Sheriff's Department says its

10   policy makes between its policy regarding hoods and a valid penological interest.  On the

11   undisputed record, then, the policy is legitimate and neutral because, as noted above, the policy

12   exists to aid correctional officers in identifying inmates, to prevent contraband from coming into

13   the jail and to prevent fighting between inmates.  Choudhry also does not challenge Cervantes

14   being required to follow the rules of the Facility.  As a consequence, again on this record,

15   defendants have satisfied the first *Turner* prong.

16        As to the second prong, Choudhry did not have an alternative to wearing her hood.

17   Taking the facts in the light most favorable to Choudhry, she asked Cervantes for a religious

18   accommodation and Cervantes did not offer her one.  Without some accommodation that would

19   have allowed her to cover her head, a jury could find Cervantes effectively required Choudhry to

20   violate a sincerely held religious belief, one she avers she had been observing since she was

21   thirteen.  While the "no hoods or hats policy" may have been a requirement applicable to

22   detainees at the jail, a jury could find Cervantes' following that requirement, without also abiding

23   by the jail's Policy 1013 providing accommodations violated Choudhry's sincerely held religious

24   beliefs.  *Cf. Fuqua*, 120 F.4th at 1354 (prison procedural requirements can violate Free Exercise

25   Clause when they don't take account of the substance of a prisoner's sincerely held religious held

26   belief).  A reasonable jury could find the second prong of the *Turner* test weighs in favor of

27   finding Choudhry's First Amendment rights were violated.

28

22

1    Third, a reasonable jury could find Cervantes would not be negatively impacted by

2    deviating from the "no hoods or hats" policy with respect to Choudhry because the jail had a

3    religious accommodation policy—Policy 1013—that Cervantes could have followed.  Had

4    Cervantes known about and been trained on Policy 1013, he could have addressed Choudhry's

5    accommodation request with Hobson—who was standing close by—or with the correctional

6    deputies who were motioning him to take Choudhry's hood off through the window.  A

7    reasonable jury could thus find the third prong of the *Turner* test weighs in favor of finding

8    Choudhry's First Amendment Rights were violated.

9    Finally, a reasonable jury could find there was a ready alternative in that Cervantes could

10   have followed Policy 1013.  He could have allowed Choudhry to wear her hood as an exception

11   to the "no hoods or hats" policy, as Hobson did by putting the hood back on Choudhry.  He could

12   have supplied Choudhry with one of the hijab's provided by the jail.  Or he could have consulted

13   with jail staff to determine the appropriate accommodation.  A reasonable jury could thus find the

14   fourth *Turner* prong weighs in favor of finding Choudhry's First Amendment rights were

15   violated.

16   As a reasonable jury could find three of the four *Turner* prongs weigh in favor of

17   Choudhry's allegation that Cervantes deprived her of her First Amendment Rights, the court finds

18   there is a dispute of material fact over whether Cervantes violated Choudhry's First Amendment

19   rights when he pulled down her hood in the medical room after she requested it remain on to

20   accommodate her religious beliefs.

21   The court thus proceeds to consider Cervantes' argument he is entitled to qualified

22   immunity on Choudhry's First Amendment claim.

23   ### b.    Qualified Immunity

24   Officers can be entitled to summary judgment even though genuine disputes of material

25   fact otherwise required a jury to determine whether their actions violated the First Amendment.

26   That is because "[a] government official's entitlement to qualified immunity depends" not only

27   on "whether there has been a violation of a constitutional right," but also on "whether that right

28   was clearly established at the time of the officer's alleged misconduct."  *S.R. Nehad v. Browder*,

1    929 F.3d 1125, 1140 (9th Cir. 2019) (citation and marks omitted). If a deputy's conduct did not

2    violate any "clearly established" law, then he is immune, no matter whether that conduct was in

3    fact ultimately unconstitutional. *See Vos v. City of Newport Beach*, 893 F.3d 1024, 1035 (9th Cir.

4    2018).

5          "Clearly established means that, at the time of the officer's conduct, the law was

6    sufficiently clear that every reasonable official would understand that what he is doing is

7    unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal marks and citation

8    omitted). The clearly established law must be defined with a "high degree of specificity," *id.* at

9    590 (internal marks and citation omitted), and the court must match the "particular

10   circumstances" and "context" to controlling law, *id*. The "existing precedent," in other words,

11   "must have placed the statutory or constitutional question beyond debate," and must "squarely

12   govern[] the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam)

13   (internal marks and citation omitted). It must be "dictated by controlling authority or a robust

14   consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589 (internal citations and

15   marks omitted). It is the plaintiff's burden to show a right was clearly established at the time, not

16   the defendant's, *Davis v. Scherer*, 468 U.S. 183, 197 (1984), but courts also are required to draw

17   on their own "full knowledge" and "other relevant precedents," as it is a "question of law"

18   whether the right was indeed "clearly established at a particular time," *Elder v. Holloway*,

19   510 U.S. 510, 516 (1994) (citations, alterations and quotation marks omitted). The "clearly

20   established law" doctrine ultimately protects officers who make "reasonable mistakes . . . as to

21   the legal constraints on particular police conduct." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

22         When an officer asserts qualified immunity at summary judgment, "courts may not

23   resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v.

24   Cotton*, 572 U.S. 650, 656 (2014) (citations omitted) (per curiam). Rather, "when there are

25   disputed factual issues that are necessary to a qualified immunity decision, these issues must first

26   be determined by the jury before the court can rule on qualified immunity." *Nehad*, 929 F.3d at

27   1140 (quoting *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)). But officers are entitled to

28   qualified immunity if their actions violated no clearly established law even when the evidence is

1    taken in the light most favorable to the non-moving party.  *See generally Kisela*, 138 S. Ct. at

2    1148 (granting qualified immunity at summary judgment after construing evidence in light most

3    favorable to non-moving plaintiff).  These rules are not "specific to qualified immunity; it is

4    simply an application of the more general rule that a 'judge's function' at summary judgment is

5    not 'to weigh the evidence and determine the truth of the matter but to determine whether there is

6    a genuine issue for trial.'"  *Tolan*, 572 U.S. at 656 (quoting *Anderson*, 477 U.S. at 249).

7         Here, the facts viewed in the light most favorable to Choudhry are as follows:

8    •  Choudhry was wearing a hooded sweatshirt as a hijab as well as an inner hijab.

9       *See* Choudhry Dep. at 82.

10   •  Cervantes was not trained in Policy 1013 as he was not an employee of the

11      Facility.  *See* Cervantes Dep. at 28, 30, 41, 69.[8]

12   •  An officer at the Facility motioned to Cervantes to take off Choudhry's hood.  *See*

13      *id.* at 53, 61.

14   •  Cervantes pulled off Choudhry's hood in the medical room.  *See* Video 2 at 0:23.

15   •  After Cervantes pulled off her hood, Choudhry asked Cervantes for him to put

16      back her hood and inner hijab on account of her religious beliefs.  Choudhry Dep.

17      at 55.

18   •  Cervantes pulled Choudhry's hood off because he was aware of the Facility's "no

19      hoods or hats" policy.  *Compare* Choudhry Dep. at 55 *with* Cervantes Dep. at 53.

20   •  Hobson stood nearby and did not tell Cervantes she had granted Choudhry an

21      accommodation only minutes earlier and it is not clear Cervantes was aware

22      Choudhry was using her hood as a hijab when Cervantes initially took it off.  *See*

23      Video 2 at 0:11–0:23, Sheriff's Dep't Dep. at 183.

24        On these facts, as of July 31, 2020, there was no clearly established law that required

25   Cervantes to provide Choudhry with a religious accommodation.  First, Choudhry has not met her

---

[8] At oral argument, Choudhry argued without evidence that Cervantes was acting as an agent of the Facility when he was in the medical room with Choudhry.  This claim, without any evidence to support it, is not enough to dispute whether Cervantes was an employee or agent of the Facility.  *See Nelson*, 83 F.3d at 1081–82.

25

1    burden to show there was clearly established law at the time of the incident putting Cervantes on

2    notice that the Facility's requirement to take off the hoods of detainees was unconstitutional in

3    light of Choudhry's request her hood remain on for religious reasons.  *See Davis*, 468 U.S. at 197.

4    As noted above, Choudhry has not provided any explanation other than a single conclusory

5    statement that the court should not grant Cervantes qualified immunity.  *See* Opp'n at 22.  In

6    other words, Choudhry provides no binding precedent from the Ninth Circuit or Supreme Court

7    or "robust consensus of cases of persuasive authority" to support her position.  *Wesby*, 583 U.S. at

8    63.  Second, the court, drawing on its "full knowledge" and "other relevant precedents" finds no

9    such controlling or persuasive authority.  *See Elder*, 510 U.S. at 516.

10           Third, the existing legal precedents and persuasive authority addressing First Amendment

11   religious apparel cases at the time of the incident here lead the court to conclude Cervantes could

12   be found, at most, to have made a reasonable mistake in taking off Choudhry's hood as it is not

13   established he knew she was wearing it for religious purposes and it is undisputed Hobson did not

14   tell him she had just accommodated Choudhry's request to have her hood put back on.  *See* State

15   Defs.' Mem. at 7–8.  For example, in *Standing Deer v. Carlson*, decided in 1987, the Ninth

16   Circuit upheld a prison regulation that banned religious headwear in the prison dining halls; in

17   following *Turner*, the Circuit held "the dress regulation involved in this case is logically

18   connected to the concerns of cleanliness, security, and safety that were invoked to justify it."

19   831 F.3d 1525, 1528 (9th Cir. 1987).  Given this authority, assuming Cervantes heard Choudhry's

20   request her head be covered, he might have reasonably believed he did not need give Choudhry

21   even a jail-issued hijab as an alternative to her wearing her hood.  In *Ward v. Walsh*, decided in

22   1993, the Ninth Circuit held jails do not have an affirmative obligation under the First

23   Amendment to provide inmates with religious garments, as doing so might "[a]llow[] one

24   prisoner to receive preferential treatment" and "potentially cause conflicts among inmates and

25   providing each prisoner with the clothing or other implements necessary to the practice of their

26   religion would impose a cost that would be more than de minimis."  1 F.3d 873, 880 (9th Cir.

27   1993).  Most persuasive authority from other circuits also did not put Cervantes on notice of any

28   potentially higher standard, and generally would have supported Cervantes' belief that the

1  Facility's "no hoods or hats" policy did not require an exception to accommodate Choudhry's

2  request that her head be covered.  *See Zargary v. New York*, 412 F. App'x 339 (2d Cir. 2011)

3  (requiring inmate to remove religious headscarf she wore as part of her religious observance as an

4  Orthodox Jew for booking photo did not violate her First Amendment rights under *Turner*);

5  *Young v. Lane*, 922 F.2d 370, 377 (7th Cir. 1991) (upholding ban on wearing of yarmulkes by

6  Jewish inmates in communal prison areas); *Hall v. Bellmon*, 935 F.2d 1106, 1113 (10th Cir.

7  1991) (upholding ban on Native American talismans worn around the neck); *Muhammad v.*

8  *Lynaugh*, 966 F.2d 901, 902–03 (5th Cir. 1992) (upholding ban on kufi caps worn by Muslims in

9  communal prison areas); *Hathcock v. Cohen*, 287 F. App'x 793, 799–800 (11th Cir. 2008)

10  (upholding prison's requirement to submit kufi caps worn by Muslim inmates to chaplain for

11  approval before wearing); *Benjamin v. Coughlin*, 905 F.2d 571, 578–79 (2d Cir. 1990) (upholding

12  restrictions on the wearing of Rastafarian crowns); *but see Boles v. Neet*, 486 F.3d 1177 (10th Cir.

13  2007) (holding forced removal of yarmulke worn by Jewish inmate during transit to hospital

14  violated prisoner's First Amendment rights).

15      Moreover, the Ninth Circuit has held since at least 1993 that an officer who follows a

16  facially constitutional ordinance, law, or jail regulation policy has qualified immunity even if his

17  application of such a law, regulation or policy violated a prisoner's constitutional rights.  *See*

18  *Grossman v. City of Portland*, 33 F.3d 1200, 1208–1210 (9th Cir. 1993); *see also Rogers v.*

19  *Giurbino*, No. 11-560, 2016 WL 8578589, at *15 (S.D. Cal. July 22, 2016), *aff'd* 731 Fed. App'x

20  722 (9th Cir. 2018) (applying *Grossman* to prison regulations).  Here, no one contests the "no

21  hoods or hats" policy was facially unconstitutional, and it is undisputed Cervantes was following

22  this policy as directed by Facility officials.  *Grossman* is not exactly on point, as Cervantes was

23  also not following another policy: Policy 1013.  But *Grossman*, read together with *Standing Deer*

24  and the other persuasive authority cited above, could have led Cervantes to form the reasonable

25  belief that taking Choudhry's hood off did not violate her First Amendment rights.

26      The court grants Cervantes qualified immunity with respect to Choudhry's First

27  Amendment claim.  The court therefore grants the State defendants' motion for summary

28  judgment as to Cervantes.

1          **B.      County Defendants**

2                  **1.      Official Capacity Defendants**

3          Choudhry brings claims against both Tulare County and Sheriff Boudreaux in his official

4  capacity as the head of the Sheriff's Department. *See* First Am. Compl. at 1. Courts treat official

5  capacity claims like the ones Choudhry brings against Sheriff Boudreaux as claims against the

6  entity itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Choudhry thus is effectively

7  bringing claims against the Sheriff's Department and Tulare County. But Choudhry has not made

8  one claim or even one assertion of fact against Tulare County independent of her claims against

9  the Sheriff's Department. Under these circumstances, keeping Tulare County in the litigation

10  would be confusing and, at the very least, redundant. District courts frequently dismiss these

11  kinds of duplicative and redundant official capacity claims. *See, e.g., Rose v. County of*

12  *Sacramento*, 163 F. Supp. 3d 787, 793 n.1 (E.D. Cal. 2016). As it would be redundant to keep

13  Tulare County as a defendant, the court grants the County defendants' motion for summary

14  judgment as to Tulare County on all of Choudhry's claims.

15                  **2.      *Monell* Claim**

16          County defendants assert Choudhry has failed to show there is a dispute of material fact

17  over whether the Sheriff's Department had an unlawful policy or practice such that it could be

18  liable under *Monell*, 436 U.S. at 658. *See* Cnty. Defs.' Mem. at 16. Choudhry responds by

19  arguing that "in a case like this one where [a] facially constitutional policy is unconstitutionally

20  applied, the government is still 'liable if the employee has not been adequately trained and the

21  constitutional wrong has been caused by that failure to train.'" Opp'n at 19 (quoting *City of*

22  *Canton v. Harris*, 489 U.S. 378, 387 (1989)). As noted above, County defendants argue

23  Choudhry only alleged an unconstitutional policy theory of *Monell* liability in her operative

24  complaint. *See* Cnty. Defs.' Reply at 5, 8–9.[9] First, without considering Choudhry's failure to

25  train, the court finds there is no dispute of material fact that would allow Choudhry to advance

_____

        [9] As noted above, County defendants argue the opposition brief is confusing because it
contains arguments relating to both State and County defendants. The court, however, is not
convinced as the brief actually contains no arguments relating to State defendants.

1    her claim that County defendants had an unconstitutional policy.  Policy 1013, had it been applied

2    to Choudhry by all of the correctional deputies at the Facility, would have done everything

3    Choudhry claims she wanted: the policy would have allowed her to have her head covered for

4    religious purposes while incarcerated, including while having her booking photo taken.  The court

5    thus grants County defendants summary judgement on Choudhry's *Monell* claim insofar as it

6    alleges County defendants had an unconstitutional policy.

7        Further, assuming without deciding Choudhry has adequately alleged a failure to train

8    theory of *Monell* liability in her complaint, Choudhry's failure to train claim fails because there is

9    no dispute of material fact requiring a jury to determine whether the Sheriff's Department failed

10   to train its employees regarding religious accommodations, leading to recurring constitutional

11   violations.

12       Municipalities are liable for failing to train their employees when that failure amounts to

13   deliberate indifference "to the rights of those who deal with municipal employees." *Benavidez v.*

14   *County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021).  But "[a] municipality's culpability

15   for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."

16   *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  To prove a failure to train claim, Choudhry must

17   "include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a

18   municipal training policy that amounts to deliberate indifference to constitutional rights; and

19   (3) that the constitutional injury would not have resulted if the municipality properly trained their

20   employees." *Benavidez*, 993 F.3d. at 1153–54 (citing *Blankenhorn v. City of Orange*, 485 F.3d

21   463, 484 (9th Cir. 2007)).  A single instance of unlawful conduct "is insufficient to state a claim

22   for municipal liability under section 1983," as "[m]ere negligence will not suffice to show *Monell*

23   liability." *Id.* (citations omitted).

24       Choudhry has alleged a single incident of negligent conduct, namely correctional deputies

25   at the Facility did not abide by Policy 1013 when they refused to grant Choudhry a religious

26   accommodation and allow her to wear her hood as a hijab.  Choudhry has not identified anyone in

27   the five years preceding her alleged injury who did not receive a religious accommodation when

28   detained or incarcerated by County defendants.  *See* Req. for Admission No. 30.  It is undisputed

1    County defendants have provided religious accommodations to Muslim women, including

2    allowing them to have their mugshot taken with their hijab on, both prior to and after Choudhry's

3    alleged injury. *See* Sheriff's Dep't Dep. at 56. The Sheriff's Department had and continues to

4    have a policy that grants religious accommodations for Muslim women who desire to wear hijabs.

5    *See* Policy 1013. They have regularly trained their employees on the policy. *See* Sheriff's Dep't.

6    Dep. at 156–57; Hobson Dep. at 18–19; Delgado-Morales Dep. at 181–83; Johnson Dep. at 15–

7    16. That their employees abide by this policy is reflected in the number of incarcerated Muslim

8    women who have received accommodations. *See* Sheriff's Dep't Dep. at 56.

9         Choudhry argues that County correctional deputies were not effectively trained on either

10    Policy 501.3 or 1013. *See* Opp'n at 9, 20–21. Specifically, Choudhry alleges deputies are

11    confused regarding how to apply the language in Policy 1013 to a woman wearing a hijab while

12    her mugshot is being taken, and this confusion constitutes deliberate indifference on the part of

13    the County defendants. *See id.* at 20–21. But there is no evidence in the record that confusion

14    resulted in systematic failures such that the rights of multiple women were violated. *See* Req. for

15    Admission No. 30. Choudhry also argues the Sheriff's Department failed to train CHP officers,

16    including Cervantes and Pimental, on Policy 1013. *See* Opp'n at 21. When he was deposed,

17    Cervantes said he was unaware of the Sheriff's Department's policy on religious accommodation.

18    *See* Cervantes Dep. at 69. But Choudhry has only pointed to the one instance that at most could

19    qualify as negligent conduct: Cervantes' taking Choudhry's hood off in the medical room. *See*

20    Req. for Admission No. 30. Further, Choudhry can point to no case, and the court is aware of

21    none, holding a county agency can be held liable under *Monell* for failing to train officers of

22    another agency, even when those officers occasionally interact with the county agency. For her

23    failure to train claim to survive summary judgment based on sufficient evidence of deliberate

24    indifference, Choudhry would need to point to multiple instances of failures to accommodate

25    inmates' religious accommodation requests when an officer was not trained to create a dispute of

26    material fact regarding whether County defendants could be found liable. *See Benavidez*,

27    993 F.3d. at 1153–54.

28    /////

30

1    Choudhry argues she does not need to allege a "pattern of similar violations" because of

2    "the known frequency with which arresting officers and deputies book arrestees who may require

3    religious accommodations."  Opp'n at 21 (citing *Connick*, 563 U.S. at 63-64).  There is a "narrow

4    range" of exceptions to the general rule that one instance of negligent conduct is not enough to

5    support a failure to train theory of liability.  *See Connick*, 563 U.S. at 63 (citing *Canton*, 489 U.S.

6    at 390 n.10).  But the range is extremely narrow: one example is a municipality's failure to train

7    employees on the proper use of lethal force because it is "so obvious that failure to do so could

8    properly be characterized as deliberate indifference to constitutional rights."  *Benavidez*, 993 F.3d

9    at 1153 (quoting *Canton*, 489 U.S. at 391 n.10).  In *Connick* itself, the case Choudhry cites, the

10    Court found that *Brady*[10] violations "do[] not fall within the narrow range of *Canton's* . . . single

11    incident [of] liability."  563 U.S. at 64.  Choudhry has not shown, by citing caselaw or arguing by

12    analogy, how the consequences of not following Policy 1013 or Policy 501.3 are so dire that a

13    single violation is sufficient to support a finding of constitutional violation based on failure to

14    train.  Rather, the precedent allowing jails in certain instances to restrict or even ban religious

15    headwear for penological purposes suggests there is no basis for finding this case falls into the

16    narrow exception category.  *See Standing Deer*, 831 F.2d at 1525 (allowing jail to ban religious

17    headwear in its dining hall to maintain cleanliness).

18    The court grants County defendants' motion for summary judgment on Choudhry's

19    *Monell* claim.

20        **3.    RLUIPA**

21    Section 3(a) of the federal RLUIPA protects the religious rights of inmates.  It provides:

22    "[n]o government shall impose a substantial burden on the religious exercise of a person residing

23    in or confined to an institution . . . even if the burden results from a rule of general applicability,

24    unless the government demonstrates that imposition of the burden on that person" is "(1) in

25    furtherance of a compelling governmental interest; and (2) is the least restrictive means of

26    furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  The scope of the

---

[10] *Brady v. Maryland*, 373 U.S. 83 (1963).

1    /////

2    religious exercise protected by RLUIPA is broader than what is protected by the First

3    Amendment.  *See Apache Stronghold v. United* States, 101 F.4th 1036, 1062–63 (9th Cir. 2024).

4           As noted above, the Ninth Circuit has found a person's religious practices are

5    "substantially burdened" when a facility "forbid[s] conduct that an inmate believes [s]he is

6    religiously compelled to do" or when a facility "compel[s] an inmate to do that which [s]he is

7    religiously forbidden from doing." *Fuqua*, 120 F.4th at 1353 (quoting *Jones*, 23 F.4th at 1140).

8    "Although RLUIPA does not preclude inquiry into the sincerity of a prisoner's professed

9    religiosity, the truth of a belief is not open to question." *Id.* at 1355 (quoting *Cutter v. Wilkinson*,

10   544 U.S. 709, 725 n.13 (2005)).  The Ninth Circuit also has held a pre-trial detention facility, like

11   the Facility in Tulare County, constitutes an "institution" for the purposes of RLUIPA.  *See*

12   *Khatib v. County of Orange*, 639 F.3d 898, 903 (9th Cir. 2011).  Plaintiffs can obtain damages

13   awards against municipal governments under RLUIPA.  *See Centro Familiar Cristiano Buenas*

14   *Nuevas v. City of Yuma*, 651 F.3d 1163, 1168–69 (9th Cir. 2011).

15          For purposes of this claim, the court finds there is a dispute of material fact regarding

16   whether the Sheriff's Department substantially burdened Choudhry's religious exercise by

17   forcing her to take off her hoodie and have her mugshot photos taken bareheaded.  Construing the

18   factual record most favorably to Choudhry, as required here, she is a practicing Muslim woman

19   whose religious beliefs mean she cannot have her head uncovered in the mixed company of men.

20   Having her head uncovered makes Choudhry feel like she is "naked" and it is "hurtful"

21   "traumatic" and "embarrassing."  Choudhry Dep. at 110–11.  Choudhry came into the Facility

22   with her hood draped over her head.  *See* Video One at 0:05.  When Hobson took her hood off,

23   Choudhry requested it be put back on and Hobson accommodated that request.  *See* Choudhry

24   Dep. at 54.  Hobson did not communicate this accommodation request to anyone else working at

25   the Facility.  *See* Hobson Dep. at 81.  Choudhry made a similar request to Cervantes but he

26   denied it, as Hobson stood only several feet away.  *See* Choudhry Dep. at 55; Sheriff's Dep't Dep.

27   at 183.  Later, she made a similar request to Delgado-Morales who also denied her request and

28   took three photos of her without her hijab on.  *See* Choudhry Dep. at 59.  Then Choudhry was

1    required to sit in a waiting room where men were present without a head covering for over an

2    hour. *See generally* Videos 6–7. After Choudhry put her hood back on in her cell, she came out

3    with her head covered. *See* Video 10 at 17:31. But then Johnson instructed her to take her hood

4    off again before she left the Facility. *See* Choudhry Dep. at 119. A reasonable factfinder would

5    conclude Choudhry was both compelled to do something she was religiously forbidden from

6    doing, having her head uncovered in the mixed company of men, and was prevented from doing

7    something she believed she was compelled by her religion to do, wear a covering over her head in

8    the mixed company of men. *See Fuqua*, 120 F.4th at 1353.

9          County defendants argue any imposition on Choudhry's religious beliefs was de minimis,

10    primarily because Choudhry spent less than six hours in the Facility and because her head was

11    only uncovered for several hours. *See* Cnty. Defs.' Mem. at 12–14. In support, County

12    defendants point to two cases, *Mbonyunkiza v. Beasley*, 956 F.3d 1048 (8th Cir. 2020), and

13    *Gallagher v. Shelton*, 587 F.3d 1063 (10th Cir. 2009). *See id.* at 12. Both of these cases involve

14    intermittent denials of an inmate's religiously required diet. Both cases rest on First Amendment

15    claims and not claims under RLUIPA, which provides broader protection. *See Apache*

16    *Stronghold*, 101 F.4th at 1062–63. Even if the cases are persuasive, Choudhry argues they are not

17    analogous to her case, on the law as well as on the facts. *See* Opp'n at 11. Those receiving a

18    meal that does not comply with their religiously prescribed diet likely can forgo it or eat around

19    the forbidden foods, at least for a while. *See id.* Choudhry, however, had no available option

20    here. Being seen by unrelated men without her head covered was a violation that could not be

21    avoided given the Sheriff's Department officers did not allow her to wear her hood or offer her a

22    hijab. *See id.* at 11–12. The court is not persuaded by County defendants' argument that

23    Choudhry's head was uncovered for too little time to support a violation of the federal statute.

24    Not only was the time significant, nearly half of the time Choudhry spent at the Facility; for

25    Choudhry, based on her testimony, any amount of time spent without a head covering in the

26    presence of unrelated men meant she was violating her religious beliefs and experiencing

27    cognizable harm as a result. Congress included pre-trial detention facilities in its definition of

28    "institutions," in the RLUIPA statute, because it envisioned temporary detention such as what

/////

Choudhry experienced at the Facility can involve exposure to official conduct that substantially

burdens a detainee's religious practices. *See Khatib*, 639 F.3d at 903.

County defendants also argue Choudhry's religious beliefs are not sincere. *See* Mem. at

13. According to County defendants, Choudhry was not wearing a hijab when she was pulled

over; she was wearing a short-sleeved sweatshirt with her forearms uncovered. *See id.* Choudhry

by contrast claims she was wearing a hooded sweatshirt as a hijab as well as an "inner hijab." *See*

Choudhry Dep. at 154–55. It is undisputed she was wearing a hood when arrested and brought to

the Facility and she asked Hobson to put her hood back on based on her religious beliefs. *See*

Choudhry Dep. at 54. Regarding the short-sleeved sweatshirt, Choudhry's counsel observes she

was travelling with a female companion and her children in the dead of night; she was not

expecting to be in the mixed company of men when she was pulled over. *See* Opp'n at 3–4. It is

true there is no evidence Choudhry requested sleeves to cover her arms while she was in the

Facility. Ultimately, if the County really wishes to challenge the sincerity of Choudhry's

religious beliefs, this would be a disputed fact for a jury to resolve.

Finally, County defendants attempt to blame only Cervantes. *See* Cnty. Defs.' Mem. at

13–14. They note when Choudhry was formally admitted to the Facility after her medical exam,

she was not wearing any covering over her head, and she did not make an accommodation request

on her intake questionnaire. *See id.* Thus, County defendants say, Cervantes was the one who

violated Choudhry's religious beliefs. *See id.* at 13. This argument disregards Hobson's actions,

which a reasonable jury could find amounted to failures to inform other officers at the Facility of

Choudhry's accommodation request, to give Choudhry a jail-supplied hijab, or to electronically

record Choudhry's accommodation request in Choudhry's paperwork. *See* Hobson Dep. at 81–

82. County defendants also rely only on their own version of the facts, which is disputed, without

acknowledging the possibility a jury could believe Choudhry, that she requested religious

accommodations from both Delgado-Morales before he took her mugshot and from Johnson

when she later told Choudhry to take her hood back off. *See* Choudhry Dep. at 59, 119. Viewing

the factual record in the light most favorable to Choudhry at this stage of the litigation, *see*

1     /////

2 *Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88, County defendants' argument that Choudhry

3 never asked for an accommodation after she was formally admitted to the Facility is unavailing.

4         County defendants also argue the Sheriff's Department's "no hoods or hats" policy

5 furthers a compelling governmental interest in identifying inmates at the Facility and it is also the

6 least restrictive means to further this compelling governmental interest. *See* Cnty. Defs.' Mem. at

7 14–15. As Choudhry points out in response, however, the Sheriff's Department's own policy,

8 Policy 1013, provides an exception to its default "no hoods or hats policy." *See* Opp'n at 15–16.

9 County defendants suggest that hoods are different than hijabs: the Sheriff's Department would

10 allow a hijab to be worn but not a hood. *See* Cnty. Defs.' Mem. at 15. But, given the undisputed

11 facts construed in Choudhry's favor as required, County defendants did not allow her to wear any

12 sort of head covering, including a jail-issued hijab. *See* Hobson Dep. at 81–82; Choudhry Dep. at

13 59, 119 (Delgado-Morales and Johnson did not offer Choudhry a hijab). There is at least a

14 dispute of material fact regarding whether the Sheriff's Department's "no hoods or hats" policy

15 was the least restrictive means to further a compelling governmental interest.

16         Finally, County defendants make two arguments for their prevailing at this stage on

17 plaintiff's request for remedies. Without citation, the County defendants argue RLUIPA does not

18 provide a damages remedy. *See* Cnty. Defs.' Mem. at 15. But the Ninth Circuit has held there is

19 no statutory bar to damages claims against municipal governments under RLUIPA. *See Centro*

20 *Familiar Cristiano Buenas Nuevas*, 651 F.3d at 1168–69 ("[F]ederal courts may award monetary

21 damages against municipal entities, absent clear statutory language to the contrary"). Second,

22 County defendants argue Choudhry's requests for equitable relief have been rendered moot

23 because the Sheriff's Department has taken her file, which includes her photos, off its online

24 system and only female deputies have access to it and only as needed related to this case. *See*

25 Cnty. Defs.' Mem. at 15. Choudhry seeks destruction of the photographs given that if they are

26 not destroyed the photographs could be seen by male employees of the Sheriff's Department at

27 some point in the future. *See* Prayer for Relief. Whether the photos could be obtained by

28 someone, including unrelated males, making a public records request under California

1    /////

2    Government Code section 7921 is disputed, but is something that could be addressed at trial.  *See*

3    Opp'n at 5, 12.

4         There is no basis in the record or otherwise before the court for precluding Choudhry from

5    seeking damages and equitable relief based on her RLUIPA claim.

6         County defendants' motion for summary judgment on Choudhry's RLUIPA claim is

7    denied.

8              **4.  State Law Claims**

9         County defendants argue they are entitled to immunity from liability for Choudhry's state

10   law claims of violation of the California Constitution, the Tom Bane Act, and the Ralph Civil

11   Rights Act.  County defendants rely on California Government Code section 844.6, which grants

12   public entities immunity from any injuries to any prisoner.  *See* Cnty. Defs.' Mem at 17–18.

13   Choudhry does not oppose County defendants' motion in this respect.  Nevertheless, County

14   defendants must still show they are entitled to summary judgment as a matter of law.  *See*

15   *Heinemann*, 731 F.3d at 917.

16        California Government Code section 844.6 states a "public entity is not liable for . . . [a]n

17   injury to any prisoner."  The court finds the Sheriff's department is a public entity under this

18   statute as the parties do not contest this point.  A prisoner is defined as a "lawfully arrested person

19   who is brought into a law enforcement facility for the purpose of being booked . . . becomes a

20   prisoner, as a matter of law, upon his or her initial entry into a prison, jail, or penal or correctional

21   facility, pursuant to penal processes."  Cal. Gov't Code § 844.  Choudhry does not dispute that

22   she was lawfully arrested; Cervantes found probable cause Choudhry had lied to him about her

23   identity and that she was driving on a suspended license.  *See* Probable Cause Decl.  Choudhry

24   also does not dispute the Facility is a correctional facility and that she entered the facility

25   pursuant to penal processes.  The court finds Choudhry was a prisoner at the relevant time for the

26   purposes of California Government Code section 844.6.

27        County defendants have pointed to authority for the proposition that district courts

28   applying California law and California courts have granted public entities immunity under section

                                        36

844.6. for each of the claims Choudhry brings against them: a violation of the Free Exercise Clause of the California Constitution, the Tom Bane Act, and the Ralph Civil Rights Act. *See* Cnty. Defs.' Mem. at 17–18 (citing *Hussain v. County of Riverside*, No: 19-0564, 2019 WL 6736904, at *2 (C.D. Cal. Aug. 22, 2019) (California Constitution); *Towery v. California*, 14 Cal. App. 5th 226, 234 (2017) (Bane Act); *Rose v. Yuba County*, No: 21-0338, 2022 WL 1215265, at *4 (E.D. Cal. Apr. 25, 2022) (Ralph Civil Rights Act)).

As to the California Constitution, the court finds the reasoning in *Hussain* persuasive as the district court argues California courts generally apply statutory and common law immunities—like section 844.6—to claims arising under the California Constitution. *See* 2019 WL 6736904, at *2 (collecting cases). Both in that case and here, plaintiffs provided no persuasive reason why a Free Exercise claim would be so different under California law than California's other constitutional provisions as to require a different finding for the applicability of section 844.6. For Choudhry's statutory claims, the court finds *Towery* persuasive. In *Towery*, the California court of appeals determined section 844.6's immunity provision "cannot be abrogated by a statute which simply imposes a general legal duty or liability." 14 Cal. App. 5th at 233–34 (quoting *Creason v. Dep't of Health Servs.*, 18 Cal. 4th 623, 635 (1998)). Neither the Bane Act nor the Ralph Civil Rights Act impose a specific duty on public entities that would overcome the immunity conferred by Government Code section 844.6. Also, Choudhry is not bringing claims against county correctional deputies in their personal capacities, such that County defendants might be liable via a theory of *respondeat superior*. *See Towery*, 14. Cal. App. 5th at 233. The court finds the Sheriff's Department has immunity under California law in the face of all of Choudhry's state law claims.

The court grants County defendants' motion for summary judgment on all of Choudhry's state law claims.

## V.    CONCLUSION

For the reasons stated above, the court **grants in full** State defendants' motion for summary judgment (ECF No. 65). The court **grants** in part and **denies** in part County defendants' motion for summary judgment (ECF No. 64) as follows:

1      • The court grants Tulare County summary judgment on all claims.

2      • The court grants County defendants summary judgment on Choudhry's First

3        Amendment claim and her state law claims (Claims 2, 3, 4, and 5).

4      • The court denies County defendants summary judgment on Choudhry's RLUIPA

5        claim (Claim 1).

6      • The clerk of the court is to dismiss all DOE defendants without prejudice.

7      • The clerk of the court also is directed to **terminate** ECF No. 66 as it has been

8        ruled untimely by Order at ECF No. 70.

9      • The pretrial conference is set for **October 17, 2025**, at 1:30 pm in Courtroom

10       Three at 501 I Street, Sacramento, California, 95814.  The parties shall meet and

11       confer and file a joint pretrial statement no less than 14 days prior to the final

12       pretrial conference.  The provisions of Local Rule 281 shall apply with respect to

13       the matters to be included in the joint pretrial statement.  At least one of the

14       attorneys who will conduct the trial for each of the parties shall attend the final

15       pretrial conference.  All motions in limine must be filed in conjunction with the

16       joint pretrial statement.  In most cases, motions in limine are addressed and

17       resolved on the morning of the first day of trial.  The parties may alert the court at

18       the final pretrial conference and in their final joint pretrial statement that a

19       particular motion or motions should be resolved earlier.  At the final pretrial

20       conference, the court will set a briefing and hearing schedule on the motions in

21       limine as necessary.  The parties are reminded that a motion in limine is a pretrial

22       procedural device designed to address the admissibility of evidence.  The court

23       looks with disfavor upon dispositional motions presented at the final pretrial

24       conference or at trial in the guise of motions in limine.  In their joint statement the

25       parties also should advise the court if they request referral to a court-convened

26       settlement conference with another judge of the court.

27   This order resolves ECF Nos. 64, 65.

28   /////

1       IT IS SO ORDERED.

2    DATED:  September 18, 2025.

3

_____
UNITED STATES DISTRICT JUDGE